May it please the Court, Meg Parish for Waterkeeper Alliance. I'd like to reserve three minutes of my time for rebuttal. When Congress wrote the Clean Water Act in 1972, they made cleaning up the nation's and making our waters fishable and swimmable again. To push these industries to clean up, Congress required that EPA set technology-forcing limits for them based on the best available treatment technology. But this central part of the Clean Water Act only works if these limits keep up with the best available technology, and that hasn't happened. EPA hasn't updated the technology-based limits in the seven categories that issue in this litigation for an average of 38 years. This means that these limits reflect 1980s technology and outdated water pollution concepts, like that phosphorus isn't harmful. It means that while EPA is deciding again and again not to update these limits, these industries have been allowed to discharge unlimited amounts of toxic pollutants like arsenic, lead, benzene, and dioxins, as well as nutrient pollutions like phosphorus and nitrogen that cause harmful algae blooms. And it means that those living downstream from these industries continue to be stuck with waters polluted by these toxics and nutrients. Today petitioners are challenging on the out-of-date. Are you saying EPA has to always have ELGs that are up-to-date, or do they have any discretion at all? Your Honor, this is a discretion. EPA's decisions whether or not to revise these technology-based limits are discretionary. What we are arguing in this case is that EPA abused that discretion by completely ignoring the question of whether or not their limits are up-to-date and reflect that best available technology. Ms. Parrish, could I ask you a question, sort of a threshold question? You've talked about an abuse of discretion by the EPA. You're bringing a petition in the circuit court. The interveners make the point that we don't have jurisdiction because this is not a challenge to a promulgation or approval of a rule. What you're really doing is saying that the EPA certain actions have been inconsistent with the law. Why aren't you bringing this case in the district court rather than here? Your Honor, we are bringing this case in this court under 509B1 because our challenges stem from EPA's original promulgation of these affluent limits. You're not challenging the promulgation of a rule or approval of a rule. You're challenging the way the rule is made, some preliminary steps. You're challenging the category ranking analysis. Perhaps you're challenging the preliminary category review. But you're not challenging the promulgation or approval of a rule, are you? What we are challenging is EPA's decision not to revise these rules, which the Tenth Circuit and Mayor found was akin to a challenge to an existing rule and therefore fell under the jurisdiction of Section 509B1. In addition... Because you're actually approving, the EPA is approving the existing ELG. Your Honor, in... That's how the text of the statute would cover what you are petitioning. Your Honor, in... Promulgating a rule, but by saying we're not going to revise it, they're saying that the existing affluent limitations can remain in place. That is correct, Your Honor. That's an approval of existing limitations, correct? Yes. And in Merritt, that original approval had happened many years before, but by denying petitioner's request to revise those technology-based limits, that was considered akin to a challenge to the substance of those existing technology-based limits and therefore under the jurisdiction of 509B1. That was an act... Similarly... That they didn't take, which sounds to me like something that's under the district court jurisdiction. In that case, like this one, EPA made a decision not to revise a technology-based limit. Similarly, this court... But they really haven't done that. What they have done is to take action to take three of the affluent sources, textiles, cattle, and alkaloids, and say, we want to discuss these this year rather than others that you want them to discuss in a preliminary plan. That may be... That sounds to me like some act or action that the EPA has taken prior to coming to a promulgated rule or approving a past rule. I mean, what you're saying is that the failure to do their review the way you want them to do constitutes an approval. Is that right? No, Your Honor. A number of provisions of the Clean Water Act, including Section 301D and 304M, require that the agency make decisions about which technology-based limits the agency will revise and which ones it will not revise. In Plan 15, the decision-documented issue here, EPA stated that it was fulfilling its duties under those Clean Water Act provisions that require the agency to make decisions about whether or not it will revise its technology-based limits. I'd note that this Court in our children's earth held that the Clean Water Act requires EPA to review these limits for possible revision. So, making a decision about the revision of these technology-based limits is a mandatory duty, and EPA fulfilled those mandatory duties in Plan 15 by making decisions that it would not revise these technology-based limits. The reason they gave is that we're revising three, not the seven that you want, because that's all the money we have. Is that an abuse of discretion? Is that capricious? It is, Your Honor. EPA, when EPA decided not to revise these technology-based limits for these seven categories, its decision was arbitrary and capricious because it entirely ignored an important part of the problem, a basic requirement of APA decision-making under State Farm by completely ignoring the purpose of technology-based limits in the Clean Water Act. EPA's decision lacked a substantial basis in fact, because it based its decision on a concentration ranking that is full of errors, and EPA failed to explain its decision and demonstrate that relationship between the facts found and the decisions made, especially for its decision not to revise pretreatment standards. So, it sounds like in Mayer, it was the exact same situation. There was a petition for rulemaking because the EPA chose not to revise wastewater treatment standards and leave existing ones in place, correct? Yes, Your Honor. In that case, the Tenth Circuit said that there was jurisdiction, and the exact same argument was made that the standards were not keeping up with technological developments, correct? It was a similar standard for the technology-based limits.  Yes. And here's the no petition. There is actually a petition for revision of the two plastics categories in the record, but the decision that we are challenging is EPA's Plan 15 decision not to revise all seven of these categories' limits. I bring the Court's attention to a recent unpublished decision by this Court of Food and Water Watch versus EPA, which was a similar challenge to EPA's decision not to revise the technology-based limits for CAFOs, which this Court made a decision on pursuant to Section 509B1. Also, in this Court's decision in Our Children's Earth, this Court uses the term whether or not the challenge stems from the promulgation of an effluent limit, which here we believe it does. Going back to why EPA's decision was arbitrary and capricious, EPA entirely failed to consider an important aspect of the problem. The APA prohibits entirely ignoring parts of a problem that Congress has singled out to be important in the underlying statute. Here Congress was clear that the purpose of the Clean Water Act's technology-based limits was that they keep pace with technology. For instance, the Clean Water Act includes specific technology-related factors that EPA must use when developing and revising limits. The Clean Water Act requires that EPA regularly review these limits for potential revision. And for new dischargers, for new direct dischargers, and for all indirect dischargers, the Act requires that EPA revise its limits as technology and alternatives change. This language makes clear that whether or not these limits are keeping pace with technology is at the very least an important part of the problem of technology-based limits and when they should be revised. And EPA's decision to completely ignore this piece of the problem was irrational. So what EPA did here is it based its decision for six of these categories entirely on a ranking of their median pollution concentration. That ranking did not include those current technology-based limits and it did not include any consideration of whether those current technology-based limits still reflected what is the best available technology. It did not include any consideration of technology. Neither did EPA's sort of additional discussion of the plastic molding and forming category consider whether or not the limits in that category still reflect the best available technology. EPA, this court held in our children's earth that while discretionary, EPA's decisions about which technology-based limits to revise are constrained by what the statute intends for those regulations, those limits to accomplish. And the Clean Water Act intends for those limits to keep pace with technology. When EPA made these decisions not to revise these seven categories, it completely ignored the point of technology-based limits, the whole reason that Congress put them in the Clean Water Act and designed them in this way. And that was an irrational decision where EPA abused its discretion. So are you asking us to send this back for the EPA to consider, you know, I guess you have a number of issues, right? Indirect dischargers, unaddressed pollutants, technology changes. But it could be that EPA could consider all this but still decide not to change the effluent limitations. That is an option that could happen even if you prevail in asking for further review of these different issues and, you know, deficiencies you think there are in the data. But they could come right back and just make the same decision, correct? Absolutely, Your Honor. What we are asking is that they conduct a decision-making process that is consistent with the Administrative Procedure Act and the Clean Water Act, which would require that they are considering the purpose of these technology-based limits, that they are relying on data that is accurate. But it is entirely possible that they could do that, you know, new decision-making process and come out with similar decisions. I did have a question. You know, obviously we're going to have a change in administrations here coming up. And I'm wondering if you're aware, are there any proposals that you've heard of that would radically change the system that we're reviewing now, meaning that we could come with a decision and then January 21st, all of a sudden that decision is completely different because there's some new rule or new enforcement mechanism or anything you've heard about that that might make this case not technically moot, but maybe not as significant as it might seem right now? No, Your Honor. And the technology-based limits program at EPA is really driven by the direction in the EPA, you know, under 304M, EPA must publish a biennial schedule of which technology-based limits it will and will not revise. And that applies regardless of the administration. So we're, you know, really looking at these kind of statutory questions that we don't believe will change depending on the administration. Thank you. Can we perhaps maybe narrow some of the issues, because there are a lot on the table here? On your new performance standards. Could you use the microphone? Oh, I'm so sorry. Excuse me. Where in your brief other than, your opening brief, other than your background section, do you actually make an argument about new performance standards? Your Honor, in our reply brief, we discuss that the trigger for new source performance standards, these new, these limits for new dischargers, that the direction to EPA for these is more prescriptive than just the if appropriate language for existing dischargers. We note that EPA is to revise those limits as technology and alternatives change. And I believe we use that language. I'm really interested more in a waiver forfeiture issue. It sounds like you didn't raise it in your opening. If your answer is, look at my reply brief. Is that right? No, Your Honor. We also used, we also raised it in our opening brief. In our opening brief, and I apologize.  Where? Other than the background section. What we did in our opening brief is we used the term ELGs to apply to both existing limits for existing facilities and for new facilities. And I, the terminology in these cases are confusing and I apologize for that. But we have a footnote that says, when we talk about ELGs, we are talking about both limits for existing facilities and limits for new facilities. So the whole opening brief is about both of those, the limits for new dischargers and for existing dischargers. So EPA's decision not to revise the limits for these categories was also arbitrary and capricious because EPA did not explain its decisions. EPA never explains why it is not relying on technology or why it's not even considering technology, why it ignored technology in its decision for these seven categories. And for pretreatment, EPA never explains its decision not to revise these seven categories pretreatment standards at all. And that's particularly problematic because pretreatment, there's a direction to EPA for pretreatment standards is very directive, that EPA is to revise these limits as technology and alternatives change. And the data for pretreatment is very different than what you're going to see in that concentration ranking, which only relies upon direct dischargers. EPA's decisions are also irrational because of the problems in that concentration ranking. Can I ask you a quick question? Yes. You're not saying that you could sue the EPA simply because it doesn't follow the schedule of, you know, the plan of reviews, right? That's not your position, is it? You mean in terms of the 304M schedule? Yeah, 304M1. No, we are not alleging that EPA did not meet any of its mandatory duties under 304M or any of the other provisions. The concentration ranking that EPA uses for six of these seven categories not only doesn't include any consideration of the existing limits or technology, but it is full of errors. For instance, for one of the categories that we are most concerned about here, petroleum refineries, EPA includes hundreds of facilities that are not actually petroleum refineries. Some appear to be retail stores selling propane. They have much smaller pollution footprints than an oil refinery, and they exclude all of the oil refineries in Texas. When you do that, you are likely to have a very different... Can I ask you another question?  You criticize the EPA's reliance on the DMR data, and there does seem to be some deficiencies with that, but what is your alternative? You're not going to have them go out and try to get their own data from 75,000 different polluting sources, are you recommending? What's the alternative? There are several different alternatives. One is another database that EPA has called the Toxic Release Inventory Database that EPA has used previously, and this includes discharges of other pollutants often than are just in that DMR data. EPA also has access to all of these permittees submitted at permit application, where they had to sample for many, many more pollutants than are required to be monitored under their permits. So EPA could obtain all of those permit applications and use all those sampling data to put together a much more robust database of what these facilities are actually discharging. And what's the number on that? Is that the 375,000 number? In terms of the number of facilities? Are you saying go back and look at all these permit applications and create a new database? How many permit applications are there? There are approximately 2,700 direct dischargers in these seven categories, at least pursuant to EPA's nutrient report. But you want information on more than that, correct? Well, those would be the direct dischargers that are putting together those permit applications. Because you're asking for, oh, you need data on unaddressed pollutants, you need data on indirect dischargers. So, I mean, it sounds like your alternative would suffer from the same deficiencies that you're raising with EPA. If EPA looked at that permit application data, it would go pretty far into addressing that question of unaddressed pollutants. So, for instance, there's no technology-based limits for benzene coming out of petroleum refineries, but every petroleum refinery has to sample their benzene in that permit application. So, we would be able to get at least some information about what kind of levels of benzene are those facilities discharging. For indirect dischargers, our issue is much more basic than, you know, do we need another database? Our issue is that EPA never explained its decision. Why is it appropriate to rely upon direct discharger information to decide that revising these pretreatment standards where the trigger is as technology and alternatives change, why is using that concentration ranking a reasonable way to make that decision? EPA never explains that. EPA never explains anything about its pretreatment decision. And that's really our primary concern here. We are not sort of, you know, prescribing to EPA, oh, you have to figure out pretreatment standards in this way. We are really saying you need to have explained why what you did is rational, and by not doing that, you failed this basic EPA requirement. If there are no further questions, I'd like to reserve the remainder of my time. We'll still give you the three minutes. Okay. Thank you. Thank you. And so, counsel, before you begin, Mr. Maxwell? Yes. I'm going to give you a hard 15. So if we go over 15, we're not stealing time away from the other lawyer. So don't, because I know what it's like. You can be sweating there, and you're like, I got one minute. No, no, no. We're going to go 15 and five. Good morning, Your Honors. May it please the Court, my name is Gus Maxwell on behalf of the Environmental Protection Agency. With me at counsel table is Krista Hughes of EPA's Office of General Counsel. Your Honors, the Clean Water Act calls upon EPA to set discharge standards for all of our nation's point source water polluters. Congress entrusted EPA with broad discretion in managing this program, and for good reason. It's necessarily a highly complex task. EPA's Affluent Limitations and Guidelines, or ELGs, regulate everything from oil refineries to airports to textile mills. They cover 160,000 discharging facilities and address 300 different kinds of pollutants. Now, in prioritizing ELGs for revision, EPA sets its sights where it can achieve the greatest benefits. The agency looks at current pollution levels, urgent environmental and public health concerns, and considers the advances in treatment technology that are so important to petitioners in this case. Now, as EPA described in ELG Plan 15, the agency is currently working to strengthen discharge limits for coal-fired power plants and to address important administration priorities, like limiting PFAS contamination. Can I ask you a question? It looked like from your answering brief that you don't agree with the intervener's jurisdictional issue, and I'm looking at the sentence. If Program Plan 15 is reviewable, this Court has jurisdiction under 33 U.S.C. 1369b-1, which is 509b-1, which is the circuit court jurisdiction, and you cite Mayer, the Tenth Circuit case. Is that correct, that you don't agree with the intervener's jurisdictional? I'm happy to address Mayer. We are aligned with petitioners on Section 509b jurisdiction. If the Court gets that ---- You think there's jurisdiction over this case, correct, under 509b-1? Your Honor ---- Well, not ---- Okay, let me be clear. You're saying there's no final agency action. Okay, assuming there is a final agency action here, you agree with the petitioners that there is jurisdiction, and you disagree with the interveners, correct? Yes. And why is that? I want you to spell that out. Great. Setting aside our view that 509 is a great fit on the finality issue ---- Sure. If this Court determines that what EPA has done in Plan 15 is take final reviewable actions not to revise ELGs, then this challenge becomes one that looks like Mayer. It's a challenge to the existing ELG. And that's what 509b allows for. Are you admitting that the final action has been taken not to revise? Your Honor, I would say that EPA has not taken any final action in Plan 15, and I would like to address that in a moment. Just to make one more point on 509 jurisdiction. I think Mayer was correctly decided by the Tenth Circuit. I think that Mayer was correctly decided. This Court in NRDC v. EPA at 542F3-1235 seems to adopt Mayer's reasoning. And as petitioners pointed out just two months ago in Food and Water Watch v. EPA, that's Case 23-2146, this Court reviewed a challenge under the Mayer framework. It was an EPA decision not to revise a rulemaking in response to a petition under Section 553E of the APA. The agency denied that petition. This Court heard the challenge under the Mayer 509b framework. And whether there's been a petition here or not is unimportant to you? It's very important, Your Honor, and I'd like to address that. You don't distinguish the cases on the basis of whether it's a petition as it was in Mayer and there was no petition here? In a case like Mayer or Food and Water Watch, the agency had before it a petition for a rulemaking. It laid out a great deal of reasoning why the petitioners thought the rule should be revised, and the agency had an opportunity to respond to that. The agency took a final agency action saying, no, we're not going to revise that rule. Now, that's very distinct from what we have here, where EPA has made only tentative provisional prioritization determinations. And the only way that the Court should review those at all is if the Court finds that those tentative provisional determinations are final agency actions deciding not to revise a rule. They don't look a lot like final agency actions deciding not to revise a rule, though. They don't look like final agency actions at all. And if I could address final agency actions. But when you're required to do this review on a one-year basis or a five-year basis, I guess I'm unclear on why that's not a decision about whether you're going to revise that one-year review period or that five-year review period. Certainly, Your Honor, it is a cyclical five-year period for new source performance standards. But the way that EPA practically handles its ELG program is we've got new source performance standards, we've got effluent limitations and guidelines, we've got pretreatment standards. The EPA combines all of these regulatory components into a single rulemaking, calls it an ELG, and reviews every ELG for each of the 59 source categories every year. Practically speaking, the way the agency handles the review is on an iterative basis where every year the EPA will look at all the ELGs, take a broad-based survey through a category rankings analysis. The agency will then identify candidates for revision and gather more information about them through preliminary category reviews, then do detailed studies. So your position, any time there's a recurring obligation for pretreatment standards, it's one-year annual review. I agree for you for effluent limitations, it's five-year. So any time there's a recurring obligation, there's no final agency action. Is that your position? I think that the finality inquiry has to consider the nature of the agency's action here. So the review and revise provisions that are at issue in this case are reproduced at pages 6 and 7 of our brief. They require EPA generally to take a periodic look at the ELGs, review and revise if appropriate. And the agency fulfills that obligation on this rolling basis. Those provisions don't require EPA to give every ELG every consideration every year. They don't require EPA to make a yes or no, up or down decision every year. But you would agree. Let's say for some pollutant the limit is 100. When you decide not to revise the ELG, that means for that next period, everyone who has a permit to pollute can pollute up to 100. So that is their right to pollute up to 100, correct? It's their right until EPA changes its mind. Now EPA can do that in the next ELG plan, but the agency is not barred from changing its mind the very next day. Three years ago, in 2021, the EPA published an ELG plan where it said it was taking no further action on the steam electric source category. Months later, EPA issued a standalone federal register notice, giving public notice that it was in fact revising that very source category. My point is that these decisions are provisional. They're the statement of the agency's priorities just at that time. They're constantly being revisited in this annual review process. I guess I'm still not clear. Okay, you agree that if you deny a petition for rulemaking and decide not to revise an ELG, that's final agency action that would be reviewable, correct?  Okay. I guess I just don't see the distinction between that and saying we're not going to revise this, the legal obligations and rights of polluters remains the same. Why that's not the same thing? I would go back to the finality inquiry as this court addressed it in Center for Biological Diversity v. Holland just last year. That inquiry, the court says, is a practical and case-specific one. It looks at whether the agency's position is definitive and whether it has direct and immediate effect or demands compliance. Now, the determinations that we're talking about in Plan 15 do none of those things. As we've said, they're not definitive on the agency's part. But by not revising, you are setting the effluent limitations for that period until the next review, correct? Not in any legally binding sense. There is no safe harbor here. And that's my point with the steam electric rulemaking that was revised in 2021 through a standalone independent Federal Register notice. The agency published an ELG plan and said we're not revising. And then months later, before the next ELG plan issued, the agency changed its position. There's nothing to prevent the agency from doing that in the statute of regulations. The agency is allowed to revisit and amend these decisions on a rolling basis. And, in fact, the agency does so. The point of the annual review process is so that the agency can take a continuing look at all of the source categories and gather more information about certain source categories as it goes. Well, then your position is, in this case, that we should simply deny the petition. And what do the plaintiffs do? This is not the right vehicle, Your Honor, for the plaintiffs to redirect. What is the correct vehicle? If petitioners want to spur the agency to revise a particular ELG, they can petition the EPA to revise that ELG, as they did recently in the concentrated animal feeding operation rule. One petitioner group currently has such a petition pending before EPA. EPA takes a final action on that. That is a reviewable 509 action that this Court can hear. The petitioners can also influence EPA's decision-making process by commenting on preliminary ELG. Do they just refile in district court? Refile this challenge in district court? Yeah. Why not? The finality problem would still exist for petitioners in district court. I don't think that this legal framework, this theory of the case, is actionable under any EPA review mechanism. Let me ask you, on your category ranking analysis, you say we're doing this so that we can make a decision as to what provides the most significant benefits, right, in deciding which ones. But if you don't consider changes in technology, how can you make an assessment of what revisions to ELGs provide the most significant benefit? Your Honor, this question goes to, I think, one of the fundamental misconceptions in the petitioner's argument here. EPA is not making a final decision not to do or to do anything, based on the category rankings analysis alone. That is simply the first step, a preliminary screening-level step in the agency's analysis. When the agency thinks of an ELG as a candidate for revision, it learns a great deal more about that source category. It pulls individual permits. It studies treatment technologies. It looks at wastewater streams, conducts site visits. There's a great deal of information that EPA has before it when it gets to the point of actually deciding that it's appropriate to revise an ELG. The fact is, Your Honor, whether the statute requires it or not, EPA does account for the BHC factors that are at the center of this case. So only consider the technology once you decide which ones you want to do further review and potentially revise. That's right, Your Honor. That's a different point than considering changes in technology when you're making that original screening decision of which ones do we want to take a further look at. You agree with that, right? I do with the complication. So then I guess the question is, how can you make that decision of deciding which ones to look at further and trying to make that most significant benefit assessment without considering technology at that first stage? I think there are two good reasons for this. One is that EPA has the statutory authorization. It has discretion to structure this review and revision process. And the second is that EPA has the responsibility, frankly, to look at more than just the PAT factors. It needs to consider its resources, which are limited, and it needs to consider current pressing environmental concerns like PFAS contamination, which the agency has a sweeping effort across many programs, including this one, to address that contamination, which leads to a myriad of harmful effects to human health. The agency also needs to look at nutrient pollution, which is something the petitioners care about as well. I would agree that the text and structure of the Clean Water Act do envision tightening limitations with changes in technology, correct? Yes, the Clean Water Act does envision that, but it leaves EPA with discretion in choosing when to make those revisions, when those revisions are appropriate. And the agency's ability to set its own priorities, this is an area where its decision-making should be authoritative. The agency has to look at questions of policy, of science, of budget, technical considerations. These are areas where the agency deserves the greatest deference in its decision-making process. Real quick, counsel, same question I have on the other side. I'm always concerned in these environmental cases because they do take time so long. Do you know of any pending legislation, any pending with a new administration coming in that could potentially change the analysis in this case? Or is it, as the opposing counsel said, it's purely statutory, so it doesn't really matter? I would not want to speculate on what would happen in the new administration. I'm not aware of any plans that the agency has. But I would point out that granting the petition for review under these circumstances where the challenge is generalized and goes not just to the seven ELGs that the petitioners have pointed out, but really how EPA conducts its annual review in the first place, a grant to this petition would be really disruptive to EPA's program at this moment. EPA, if it needed to account for all of the concerns that petitioners raise for every one of the 59 ELGs every year, the agency would be taking on a massive, onerous new regulatory burden that would direct the agency's resources away from the work of revising ELGs and toward the bureaucratic process of laying out reasoning why EPA does not have the resources or does not believe it's a particularly beneficial effort to pursue revision for the 50 source categories that are not up this time around. Let me ask you a question about 1317b2. Would you agree, it says administrator, excuse me, says from time to time as control technology processes operating methods or other alternative change revise such standards following the procedure established by the subsection? You would agree that that does explicitly require the EPA to consider changes in technology when deciding whether to revise a pretreatment standard, right? Absolutely, and EPA considers technology when it decides to revise an effluent limitation or a new source performance standard as well. It just doesn't look at technology in that very first initial step of the category rankings analysis. Your Honors, I have exceeded my time. If there are no further questions. All right, thank you very much, Counsel. Appreciate it. Thank you. May it please the Court, Jeffrey Longsworth on behalf of the intervenors, American Fuel and Petrochemical Manufacturers and American Petroleum Institute. Federal courts have limited jurisdiction. It is Clean Water 304M planning document for which waterkeeper seeks review, the promulgation of a standard or a limitation under Section 509. The answer is it is not. Congress did not give courts of appeal jurisdiction under 509 to review planning documents. The NRDC case that has been talked about that I also litigated says this, this court has cautioned that its jurisdiction under 509B1 is not to be construed expansively, particularly given the specificity and precision that Congress used in identifying the actions that fall under 509B1. Waterkeeper, in their reply brief to our challenge of jurisdiction, first relies on legislative history. But the statute is clear, and when the statute is clear, legislative history is not necessary and it can't be used to override the very clear meaning of Section 509. Waterkeeper also relies on that Mayer case, the Tenth Circuit, and waterkeeper concedes that it's not controlling here. In fact, we would argue that Mayer in the Tenth Circuit was wrongly decided and is overruled by this court's decision in our children's earth. The Tenth Circuit broadly construed Section 509 to say something that it doesn't say. The question before this court is what is the plain reading of Clean Water Act Section 509? So if we were to agree with you, then the plaintiffs could just refile in district court, right? They could do that, of course. Waterkeeper, again using Mayer, says that it makes more sense and is more practical to construe 509 in a way that allows this court to review the challenge of a planning document. We believe that is wrong. And I want to explain a couple of things that have come up. So, for instance, in the study process of effluent guidelines, if you look at pages 9 to 11 of our brief, we describe the extensive study that EPA conducted on the petroleum refining industry in the 20-teens into the early 2020s. Sent out questionnaires to all of the refineries that are hundreds of pages long that they have to respond to under penalty of law. They visited 10 refineries. They analyzed every aspect of the refining process, and they concluded in a 60-page report that, in fact, the existing effluent guidelines are, in fact, still today, the best available technology economically achievable. And that's because it's a sophisticated process already. To your other point, Judge Koh, about if you discharge 100, then you have to wait until a new rulemaking before that's changed. It's important to understand that the ELGs are only half of the equation. That's the technology process that is nationally applicable to determine what is best available technology economically achievable. The other half of the Clean Water Act is water quality standards, which are applied on a site-by-site basis. So while Waterkeeper points out that there's a refinery in California that has much more stringent limits than a refinery in Louisiana, they assume that that's because of technology difference. It's not. It's because of local water quality. If you're discharging to a salmon stream— Let me ask you a question. Sure. They claim that there are only 9 out of 331 facilities in the petroleum refining category that report data for total nitrogen. Is that correct? That may be correct under the effluent guidelines. But, again, if there was a particular water quality issue— But then if there's a concentration ranking analysis that is only using data from 9 out of 331 facilities, then how can we say that that is doing an analysis that will really look at the most significant benefits if you're not even having all the data? Well, again, it might only be 9 because the nutrients issue is only an issue for those 9 refineries based on the state water quality standards. In addition, a lot of pollutants that have been identified by Waterkeeper are also addressed in the effluent guidelines because the treatment process for a certain number of pollutants will also treat a whole other number of pollutants. So, therefore, EPA believes that by regulating those that it has information on, it is also regulating those others. And that's a standard practice across the industry, a standard practice in the effluent guidelines program. They have studied all of these issues. They have studied the various factors that go into it, and they concluded that, at least with regards to petroleum refining, that there was no further action it could take to modify the existing effluent guidelines to generate any benefits, either economic or environmental. Let me look at another question. They say a detailed study conducted by the EPA in 2019 indicated there were 143 or fewer petroleum refineries in the United States, but the data in the category ranking analysis identified over 300 facilities as refineries. So there's just a lot of data that is not lining up. They claim EPA also excluded approximately 20 facilities that are petroleum refineries from the concentration ranking analysis because the facilities did not report data in a comparable way. Your Honor, I would direct you to the petroleum refinery study from the late teens that identifies all of the refineries and provides very significant information on all of the different refineries. I'm not going to second-guess how EPA does its studies, but it has been very thorough in its studies in the past, and it has identified appropriate ELGs to modify on a case-by-case basis, and it's been a successful program. It is complex. There is no two ways about it. These effluent guidelines take years to develop with full-time staff, million-dollar-a-year contractors according to their brief. These are very, very complex rulemakings because these are very complex industries, and there are a lot of them, and they need to reach out and work with the industries, and the industries have worked with them. It's not just industry. We talk about it as if it's industry. It's also construction stormwater. It's aircraft de-icing at airports. It covers the entire gamut of types of operations, and I would argue that having been doing this for 30 years, that EPA does an extensive job in this process, and what we're talking about today is a planning process that helps the agency set priorities for moving forward, and had it gone to the district court first, perhaps we would have a lot of this information already gleaned out and prepared for a potential challenge to the Ninth Circuit, but I don't believe this case belongs here. I'm sorry. Thank you, counsel. Appreciate it. Thank you. Hi, Your Honors. Meg Parrish for Petitioners. I can't hear you. Can you please speak up? I'm so sorry. Meg Parrish for Petitioners. I'd like to address the concerns that this is not a final agency action. As the Clean Water Act, in a number of different places, requires that EPA review its technology-based limits and make decisions regarding whether or not they are to be revised, including in Section 301D, 304B, 304G1, 306B1B, 307B2, and all of those decisions become part of this 304M schedule. EPA is required to make these decisions. Those are mandatory duties, and EPA stated in Plan 15 that it was fulfilling those mandatory duties with its decisions in Plan 15. If EPA had just discussed technological limitations in Plan 15, it would not have met those mandatory duties. This Court noted in NRDC v. EPA in 2008 that a 304M schedule is a binding legal document, that in that case, EPA made a very similar argument that their 304M schedule, their plan at the time, was just a planning document, it was just a discussion, it was iterative, it didn't really have any meaning, and this Court said no, it is a binding legal decision, and the same thing is true here. EPA made its decisions in Plan 15, and those are final agency actions. Yes, EPA can change its mind later, but just because an agency can later change its mind does not affect the finality of the agency's decision now. The Supreme Court in Army Corps v. Hawks specifically addressed this question. This is where the Army Corps had made a tentative decision that a piece of property was not subject to the Clean Water Act, and the Court said that the agency might change its mind in the future does not affect the finality. It also doesn't affect the fact that under Bennett v. Speer, significant legal consequences flow from this decision, making it a final agency action. First, EPA's decision not to revise these limits does, in fact, give safe harbor to industries covered by them because they know that even if they get new permits in the absence of another federal action, those federal technology-based limits will not change. So even if they're getting their refinery, even if they're getting a new permit for their refinery, they know those federal technology-based limits aren't going to change, and that is a significant benefit to those facilities, lowering their legal risk and constitutes a legal consequence under Bennett v. Speer. Finally, back to the question of arbitrary and capricious actions, I would note that EPA has argued here that they have this unfettered discretion to make these decisions however they want. They do not. Under the APA, EPA's discretionary decisions still have to consider the information in the record, and they still have to consider the underlying statute. And here, there is plenty of information in the record that EPA could have used to consider technology and to consider that purpose of the Clean Water Act. These include that refinery study that counsel discussed. EPA did not use that study when it made its decision in Plan 15 not to revise the limits for refineries. The only basis for its decision not to revise the limits for refineries in Plan 15 was how refineries ranked on that concentration ranking. That's it. They didn't use this other information that was in the record regarding refineries and technology. Similarly, the record has a study about membrane technology, which is a more advanced technology that EPA had found wasn't feasible, you know, back when it set many of these limits in the early and at 1980s. Similarly, EPA did not consider that study when it decided not to revise the limits for these seven categories, even though that study was in the record. EPA's failure to consider these documents that were in the record that are relevant to the question at hand was arbitrary and capricious. Do you have any further response on the intervener's jurisdictional argument? Your Honor, we agree with EPA that mayor was rightly decided and that there is jurisdiction under Section 509b1. Mayor and our Children's Earth are consistent. Our Children's Earth did not overrule mayor. In our Children's Earth, the Ninth Circuit was looking at a different question, but in our Children's Earth, the Ninth Circuit does use that language of, does the challenge stem from the promulgation of an effluent limitation? And here this challenge does, in fact, stem from that promulgation of an effluent limitation because we are, in essence, challenging the substance of the existing effluent limitation. All right. Thank you very much, counsel. Thanks to both of you for your briefing and argument in this tricky, complicated case. This matter is submitted, and we're done for the day. Thank you. Thank you.
judges: BEA, OWENS, KOH